1  Spencer C. Skeen, CA Bar No. 182116
   spencer.skeen@ogletree.com
2  Tim L. Johnson, CA Bar No. 265794
   tim.johnson@ogletree.com
3  Jesse C. Ferrantella, CA Bar No. 279131
   jesse.ferrantella@ogletree.com
4  OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
   4370 La Jolla Village Drive, Suite 990
5  San Diego, CA  92122
   Telephone: 858.652.3100
6  Facsimile: 858.652.3101

7  Attorneys for Defendant  CENTRAL FREIGHT LINES, INC.

8              **UNITED STATES DISTRICT COURT**

9            **EASTERN DISTRICT OF CALIFORNIA**

10

11 | RICKEY HENRY, an individual, on behalf of | Case No. 2:16-CV-00280-JAM-JDP
   himself, on behalf of all person similarly
12 situated, | *(Class Action)*

13              Plaintiff, | **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**
14         v.

15 CENTRAL FREIGHT LINES, INC., a | Date:       December 14, 2021
   corporation; and DOES 1 through 50, | Time:       1:30 p.m.
16 inclusive
                                         | District Judge:    John A. Mendez
17          Defendants. | Magistrate Judge:  Jeremy D. Peterson

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT FACTS .......................................................................................... 3

    A.      There is No Uniform Agreement or Model Here................................................ 3

    B.      The ICA and LOA Did Not Subject Owner-Operators to Uniform Control ..................... 3

    C.      Department of Transportation Regulations Do Not Establish Control from CFL.............. 4

    D.      Owner-Operators Varied Greatly in How They Operated Their Businesses....................... 5

    E.      Owner-Operators Varied Significantly in the Amount and Frequency of Work In and
Outside California.......................................................................................................... 6

    F.      The LOA Contains Unique Rights Distinct from the ICA .................................. 6

    G.      Plaintiff Filed a Class Action Alleging CFL Misclassified Him and Other Independent
Drivers as Independent Contractors ............................................................................. 6

III.    THE COURT'S ORDERS LIMITS THE APPLICATION OF THE ABC TEST ............. 7

IV.     THE COURT CANNOT CERTIFY A CLASS UNDER THE ABC TEST BECAUSE
THE NINTH CIRCUIT STAYED APPLICATION OF THE ABC TEST TO MOTOR
CARRIERS AND THE "UCL ABC CLASS" LACKS NUMEROSITY .......................... 7

V.      THE PROPOSED CLASS IS BROKEN BECAUSE IT SEEKS RECOVERY ON
BEHALF OF ABSENT, NON-CLASS MEMBERS FOR WORK THE PROPOSED
CLASS DID NOT PERFORM AND EXPENSES THEY DID NOT INCUR .................. 8

VI.     THE PROPOSED CLASS DOES NOT RAISE COMMON ISSUES OF
MISCLASSIFICATION AND COMMON ISSUES DO NOT PREDOMINATE............. 9

    A.      The ICA Does Not Establish a Uniform Right of Control Over the Manner and Means of
Work ............................................................................................................................... 9

    B.      The Right of Control Requires Individual Inquiries ........................................ 10

    C.      Adherence to Federal Regulations Does Not Show a Uniform Right of Control............. 11

    D.      *Borello's* Secondary Factors Require Individual Inquiries................................. 13

    E.      Determining If California Law Applies Necessitates Individual Inquiries ....................... 14

    F.      Plaintiff's Flawed Declarants Fail to Raise Common Issues............................. 16

OPPOSITION TO MOTION FOR CLASS CERTIFICATION

VII.   PLAINTIFF'S UNDERLYING CLAIMS PRESENT INDIVIDUALIZED INQUIRIES THAT CANNOT BE ANSWERED ON A CLASS BASIS ............................................... 17

VIII.   PLAINTIFF CANNOT ESTABLISH RULE 23(B)(3) SUPERIORITY ......................... 18

   A.   A Class Action Is Unnecessary Here .................................................................. 18

   B.   A Class Action Is Not Superior Because No Trial Plan Exists ......................................... 18

IX.   PLAINTIFF IS AN ATYPICAL AND INADEQUATE CLASS REPRESENTATIVE.. 19

   A.   Plaintiff Executed a Different Agreement Than Many Putative Class Members .............. 19

   B.   Plaintiff Is Not Subject to Arbitration But Other Proposed Class Members Are .............. 19

   C.   Other Putative Class Members Are Subject to Other Unique Defenses ........................... 20

   D.   Plaintiff Presents Credibility Issues and is Antagonistic to the Putative Class ................. 20

X.   CONCLUSION............................................................................................................ 20

OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007)..................................................................18

*Avilez v. Pinkerton Gov. Servs., Inc.*,
  596 Fed. Appx. 579 (9th Cir. 2015) ............................................................19

*Ayala v. Antelope Valley Newspapers, Inc.*,
  59 Cal. 4th 522 (2014).............................................................................9, 10

*California Trucking Association ("CTA") v. Bonta*,
  996 F.3d 644 (2021) ................................................................................7, 8

*Campagna v. Language Line Servs., Inc.*,
  2012 WL 1565229 (N.D. Cal. May 2, 2012)...........................................14, 15

*Conde v. Sensa*,
  2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) ..............................................19

*Cordell v. PICC Lines Plus LLC*,
  2016 WL 4702654 (N.D. Cal. Sept. 8, 2016) .................................................7

*Gen. Tel. Co. v. E.E.C.C*,
  446 U.S. 318 (1980) .....................................................................................8

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ........................................................................19

*Hernandez v. Triple Ell Transp., Inc.*,
  175 P.3d 199 (Idaho 2007) ...........................................................................12

*Jack v. Trans World Airlines, Inc.*,
  854 F.Supp. 654 (N.D. Cal. 1994).................................................................16

*Javine v. San Luis Ambulance Serv., Inc.*,
  WL 12672090, at *11 (C.D. Cal. Jan. 13, 2015) ...........................................20

*Johnson v. Serenity Transp., Inc.*,
  2018 WL 3645640 (N.D. Cal. Aug. 1, 2018) ................................................14

*Kandel v. Brother Int'l Corp.*,
  264 F.R.D. 630 (C.D. Cal. 2010)..................................................................20

*Kaplan v. Pomerantz*,
  132 F.R.D. 504 (N.D. Ill. 1990) ...................................................................20

*Lawson v. Grubhub, Inc.*,
    302 F. Supp. 3d 1071 (N.D. Cal. 2018) ........................................11

*Linton v. Desoto Cab Co., Inc.*,
    15 Cal. App. 5th 1208, 1224 (2017) ........................................11

*Magalhaes v. Lowe's Home Centers, Inc.*,
    2014 WL 907675 (D. Mass. Mar. 10, 2014) ........................................10

*Martinez v. Flower Foods, Inc.*,
    2016 WL 10746664 (C.D. Cal. Feb. 1, 2016) ........................................10, 11, 12, 13

*Narayan v. EGL, Inc.*,
    285 F.R.D. 473 (N.D. Cal. 2012) ........................................10, 13

*Negrete v. Allianz Life Ins. Co. of North America*,
    238 F.R.D. 482 (C.D. Cal. 2006) ........................................18

*Oman v. Delta Air Lines, Inc.*,
    9 Cal.5th 762, 772 ........................................14, 15

*Pryor v. Aerotek Sci., LLC*,
    278 F.R.D. 516 (C.D. Cal. 2011) ........................................9

*Soares v. Flowers Foods, Inc.*,
    320 F.R.D. 464 (N.D. Cal. 2017) ........................................13, 18

*Sotelo v. Media News Grp., Inc.*,
    207 Cal. App. 4th 639 (2012) ........................................14

*Soto v. Diakon Logistics, Inc.*,
    2011 WL 3515917 (S.D. Cal. Aug. 10, 2011) ........................................13

*Spencer v. Beavex, Inc.*,
    2006 WL 6500597 (S.D. Cal. Dec. 15, 2006) ........................................10, 13

*Tidewater Marine W., Inc. v. Bradshaw*,
    14 Cal.4th 557 (1996) ........................................14, 15

*Transunion LLC v. Ramirez*,
    141 S.Ct. 2190 (2021) ........................................8, 9

*Tschudy v. J.C. Penney Corp.*,
    2015 WL 8484530 (S.D. Cal. Dec. 9, 2015) ........................................19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................8, 19

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ........................................18

OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**Statutes**

49 U.S.C. § 14901 ...........................................................................................................12

California's Unfair Competition Law ...............................................................1, 6, 7, 8

Federal Aviation Administration Authorization Act ...............................................8

Lab. Code § 200 ...........................................................................................................8, 9

Lab. Code § 2802 ...................................................................................................8, 9, 15

## I.    **INTRODUCTION**

Plaintiff Rickey Henry ("Plaintiff") submits an inherently unmanageable proposed class of some 70 allegedly misclassified independent contractor owner-operators ("owner-operators"). He also seeks wages and expenses for the owner-operators' 211 non-owner drivers who were part of their businesses. The Court should deny the Motion for Class Certification ("Motion") for *six* key reasons.

First, although Plaintiff's class is limited to the owner-operators who contracted with Defendant Central Freight Lines, Inc. ("CFL"), CFL paid owner-operators for their business, including drivers they elected to hire. The owner-operators then elected to pay the drivers and those drivers never contracted with CFL. However, Plaintiff does not seek to exclude from the class owner-operators who had multiple trucks or drivers, and his expert and declarants confirm they are seeking wages and expenses for all the drivers, even though they are not part of the proposed class. Plaintiff cannot pursue class claims where they seek to recover alleged wages *for work another non-class member performed,* or expenses *another non-class member incurred.*

Second, Plaintiff's overreaching class definition presents individualized, unmanageable issues on misclassification. Based on this Court's two prior orders, the *Borello* test applies to all of Plaintiff's claims for misclassification, apart from his unpaid wages claim. Dkt. 87, 111. The Court also cannot apply the ABC Test to Plaintiff's "UCL ABC Class" after January 1, 2020 (the effective date of AB-5) because (1) there is a pending Ninth Circuit order that keeps an existing injunction of the ABC Test as applied to motor carriers in place (RJN, Ex. 1); and (2) CFL only utilized the services of five owner-operators after January 1, 2020, making class treatment inappropriate. Under *Borello*, individualized inquiries permeate the "control" analysis, and its secondary factors, most notably the "distinct operation or business factor." The reason is there is no "uniform" instrument of control, as different operative agreements applied to different owner-operators. Plaintiff's declarants do not recall the agreements and argue for rights inconsistent with the agreements, resulting in individualized inquiries. Even the operative agreements granted significant rights to owner-operators and provided them with broad discretion, *including the right to operate multiple trucks and hire a fleet of drivers.* Because of this, owner-operators ran distinct businesses, ranging from those operating at least 15 trucks, running 40 drivers and earning over $1 million in revenue per year, to

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

others who ran a single truck and made nominal income. Courts have routinely denied certification when faced with driver misclassification actions pursued on behalf of such diverse businesses.

Third, Plaintiff's proposed class would require individualized inquires to determine if California law even applies—an analysis the Court will have to conduct on a day-by-day, week-by-week basis. California's wage and hour laws *might* apply to work performed outside of California where "an employee resides in California, receives pay in California, and *works exclusively, or principally*, in California." However, there are many legal tests governing this inquiry, and numerous owner-operators spent less than 25% of their time within California, including *over 9,000 trips wholly outside the State*. Some also some registered their businesses outside of California. Plaintiff proposes no way to manage the question of whether California law applies to owner-operators and the numerous drivers for whom they seek wages and expenses.

Fourth, while the misclassification claims present no common issues and that ends the analysis, the underlying Labor Code claims present more individualized issues. The reason is that Plaintiff seeks recovery of wages and expenses for non-class member drivers, but does not attempt to explain how a class can proceed for the recovery of wages *not earned* by the proposed class. Plaintiff's expert ignores the fact altogether, disregarding the dispatch data showing that such drivers drove over 27% of all trips. Plaintiff's Labor Code claims raise individual issues that go to whether CFL owes wages or expenses based on *who* performed the alleged work and in *what* state.

Fifth, Plaintiff cannot establish superiority. A class action is not superior where each claim carries significant value and the putative class members can easily pursue them in separate lawsuits. Here, Plaintiff's expert seeks $200,000 in average recovery for each proposed class member, including an over $100,000 in fuel costs alone. Multiple owner-operators have already pursued these claims individually. Courts routinely find a class action is not superior in these circumstances.

Sixth, Plaintiff is an inadequate and atypical class representative. Plaintiff did not execute an arbitration agreement, while many other proposed class members did. Plaintiff also did not execute a specific indemnity agreement for non-owner drivers, while other proposed class members did. These result in individualized defenses that do not apply to Plaintiff.

For these reasons, and those that follow, the Court should deny the Motion in its entirety.

## II.    RELEVANT FACTS

### A.    There is No Uniform Agreement or Model Here

CFL is a federally registered and permitted motor carrier incorporated and headquartered in Texas. Summary of Evidence ("SE") 1. During the class period, CFL contracted services from long-haul truck drivers and companies ("owner-operators"), including Plaintiff, who performed services throughout the United States. SE 2. Owner-operators moved freight from one CFL terminal to another, while CFL received payment on actual delivery to its clients. SE 3. They operated their own businesses and some operated multiple trucks, and hired their own drivers to drive the trucks. SE 4.

Many owner-operators entered into an Independent Contractor Agreement ("ICA") with CFL under which they agreed to provide services to CFL. SE 5. More recently, others entered into a Lease and Operating Agreement ("LOA"). SE 6. Still others, including Plaintiff, do not recall entering into an agreement, and in some instances, CFL cannot locate an agreement. SE 7. Still others, including Plaintiff, testified their experiences differed from the terms of agreements. SE 8.

Under any of the agreements, owner-operators expressly agreed to provide services as "an independent contractor." SE 9. Many owner-operators signed up because they wanted the freedom to run their own business. SE 10. They considered themselves to be entrepreneurs and many prided themselves on not being employees. SE 11. Plaintiff and other owner-operators touted their experience in the trucking industry, and obtained numerous driving endorsements so there would be no limits on loads they could accept and potential revenue they could generate. SE 12.

Either party could terminate the written agreements, for any reason at any time. SE 13. CFL paid Plaintiff and other owner-operators an amount per job, based on total miles, in weekly "settlement" statements, although the rates varied depending on the nature of the business. SE 14. Plaintiff and other owner-operators provided and maintained their own truck(s), and the costs of insurance, fuel, and the satellite equipment on the trucks. SE 15. CFL reported the compensation as payments to a contractor and issued Form 1099s for services. SE 16.

### B.    The ICA and LOA Did Not Subject Owner-Operators to Uniform Control

The ICA and the LOA gave owner-operators significant rights and discretion on how to run their business. SE 17.

- *First,* CFL gave owner-operators substantial control over their working conditions and the manner in which they transported a load. SE 18. Besides complying with federally mandated motor carrier safety laws, CFL did not prescribe working conditions on owner-operators. SE 19. CFL did not prescribe or "guarantee any specific number of shipments or amount of revenue," or prescribe any minimum amount of hours or jobs. SE 20. Owner-operators set their schedule, and could "refuse any specific shipment." Plaintiff and owner-operators declined loads for many reasons, such as safety, weather, the proposed route, or personal reasons. SE 21.

- *Second,* CFL had no right to exercise control over the details of the work, "except [as] to the ultimate completed pick-up or delivery of the material hauled." SE 22. For example, owner-operators would communicate with CFL dispatch at the beginning of a trip and upon arrival. SE 23. During transport, CFL did not require owner-operators to take certain routes. SE 24. For example, Plaintiff chose to take the safest route possible, irrespective of distance. SE 25. Other owner-operators would alter their routes based on factors such as traffic, road closures, and the roads they liked, although others (in contrast with the terms of the agreements) claim they felt pressured to take a route. SE 26.

- *Third*, the ICA and the LOA expressly include the right to operate multiple trucks, hire drivers, or to work on a "team." SE 27. Owner-operators had the right to hire other drivers, over whom they exercised "all control, direction and supervision…with respect to the physical details of the work to be performed and the manner in which the work is performed." SE 28. ***Critically, these drivers did not contract with CFL. Instead, they provided services directly to the owner-operators, and Plaintiff and the owner-operators received settlement statements on behalf of themselves and all drivers***. SE 29. ***The owner-operators, not CFL, decided how to pay and classify their drivers, although many owner-operators lack records of their payments and actually believe they had more drivers than CFL's data shows***. SE 30. The rates paid to owner-operators varied depending on the agreement, whether the owner-operator had a solo operation or had multiple drivers, and could increase with miles driven, extra stops required, or negotiated rates for unique services or undesirable routes. SE 31. The rates owner-operators elected to pay their drivers also varied, and CFL had no say in those decisions. SE 32. Profit depended on many factors including the amount of trucks and drivers chosen, the amount paid to drivers, miles driven, and expenses incurred. SE 33.

- *Fourth,* while contracting with CFL, Plaintiff and other-owner-operators could work for other motor carriers. SE 34.[1] Some owner-operators also provided services for other companies, had other business ventures, or acted as absentee business owners who did not drive. SE 35.

After July 2019, apart from five owner-operators (two existing large fleet owners, and three owner-operators who drive under their own independent Department of Transportation ("DOT") authority), CFL ceased using owner-operators who reside in California. SE 36.

## C.   Department of Transportation Regulations Do Not Establish Control from CFL

Truck driving is a heavily regulated industry and subject to many rules. SE 37. Nearly all of the alleged "control" Plaintiff discusses is not the result of CFL's agreements, but is due to Department of Transportation ("DOT") regulation. SE 38; *see infra,* § VII.C. Owner-operators agree that the industry "is subject to regulation by the federal government acting through the DOT." SE 39.

---

[1] Some of Plaintiff's declarants falsely argue to the contrary, despite neither agreement prohibiting the provision of services for other motor carriers. (Garcia Decl., Dkt. 112-4 ¶ 6; Waldman Decl., Dkt. 112-9, ¶ 4.)

### D.   Owner-Operators Varied Greatly in How They Operated Their Businesses

- *Variation in Number of Trucks Operated.* The 70 owner-operators in the putative class operated at least 156 different trucks. SE 40. *Nearly half the putative class* operated more than one truck and reported increased earning potential by doing so. SE 41. Eight owner-operators operated a large fleet of more than five trucks, with one particular owner-operator operating at least *15 trucks*. SE 42. Other owner-operators, including Plaintiff, operated a single truck. SE 43.

- *Variation in Number of Drivers.* The 70 owner-operators in the putative class enlisted the services of at least 211 non-owner drivers. SE 44. At least seven owner-operators enlisted the services of 10 or more drivers each, including two owner-operators who each enlisted the services of 25 or more drivers. SE 45. On the other hand, 22 owner-operators used the services of a single driver (themselves). SE 46. Some owner-operators offered drivers their own training materials. SE 47.[2] Some owner-operators preferred to have a fleet of trucks and drivers available to make more runs, while others preferred to run smaller, more manageable businesses. SE 49.[3]

- *Variation in Routes Driven.* Overall, owner-operators did not drive approximately 27% of all trips. SE 52. Those with large fleets drove few routes themselves, with eight owner-operators driving about 25% or less of their routes. SE 53. Putative class members went significant periods (years, even) where they drove no trips and their drivers exclusively drove the trucks. SE 54. About 21 owner-operators drove all their routes. SE 55.

- *Variation in Type of Routes.* Some owner-operators chose to drive largely identical routes each day. SE 56. Other owner-operators drove many routes, spanning nearly all states. SE 57.

- *Variation in Business Structure and Operation of Other Businesses.* Many owner-operators registered their businesses, advertised them online, and chose structures that offered benefits to them. SE 58. ***Some owner-operators contracted in the name of their business entity, not their individual capacity, and registered these businesses in other states than California***. SE 59. Some owner-operators also chose to operate as a "team," alternating driving duties to increase efficiency. SE 60. Other owner-operators had co-owned their business. SE 61. Some owner-operators also operated trucks for other trucking companies simultaneously. SE 62. Others operated under their own independent DOT authority, while others operated under CFL's DOT authority. SE 63.

- *Variation in Rates / Negotiation of Rates.* Some owner-operators negotiated additional pay for less desirable or shorter routes, or for other tasks, while others did not. SE 64.

- *Variation in Equipment and Clothing.* Owner-operators controlled their equipment, dress, and appearance. SE 65. Some owner-operators placed their own business names or logos on the truck, thus advertising on them. SE 66. Owner-operators also chose the clothing they wanted to wear while driving and controlled their personal appearance. SE 67.

The above variations affected the owner-operators ability to generate revenue and profit, with some making over *$2 million per year* in gross revenue and *$888,000 per year in net revenue*, and others making far less. SE 68.

---

[2] The roles and nature of even a single business changed over time. Some drivers drove for multiple owner-operators, some drivers transitioned to an owner-operator, and some owner-operators did not drive for large periods. SE 48.

[3] While Plaintiff's declarants now contend CFL treated them as employees, they report classifying their drivers as contractors. SE 50. ***Moreover, despite the fact drivers did not contract with CFL and received compensation at the discretion of owner-operators, owner-operators seek wages and expenses on their drivers' behalf***. SE 51.

**E.   Owner-Operators Varied Significantly in the Amount and Frequency of Work In and Outside California**

Plaintiff, owner-operators, and their drivers hauled loads to 24 states outside of California for CFL. SE 69. Overall, approximately 55% of all miles driven by owner-operators occurred *outside* of California. SE 70. Some 22 owners drove about 25% or less of their miles in California, while others spent far more time in California. SE 71. Of the 62,425 trips at issue, some 9,297 *started and ended wholly outside of California*, and another 32,562 covered multiple states, meaning about *two-thirds* of all dispatched trips spanned two or more states, and did not end in California. SE 72.

**F.   The LOA Contains Unique Rights Distinct from the ICA**

Of the putative class, at least 24 owner-operators executed the LOA apart from the ICA. SE 73. Significantly, the LOA contains unique rights, including a mutual agreement to arbitrate all claims with a class waiver (SE 74) and a duty to indemnify CFL from any claims brought by a driver arising out of their provision of services, including any claims for "wages' or "benefits" (SE 75).

**G.   Plaintiff Filed a Class Action Alleging CFL Misclassified Him and Other Independent Drivers as Independent Contractors**

In May 2014, Plaintiff and CFL entered into the ICA. SE 76. Plaintiff never entered into the LOA or an arbitration agreement with CFL. SE 77. After termination of his contract with CFL in February 2015, Plaintiff continued to work as an independent contractor in the trucking industry, where he registered several businesses. SE 78. He displays his companies online, and works with a specialized agency who helps small businesses maximize profit. SE 79.

Plaintiff seeks to certify a class of "all individuals who are or previously worked for [CFL] as truck drivers who were classified by [CFL] as independent contractors and who were residents of California during the period from October 20, 2011 to the present." Motion at 1.[4] He seeks to certify a class under California's Unfair Competition Law ("UCL") for "violation of Wage Order 9, §§ 4, 7(A)(3), 8, and 9(B)" under California's ABC Test ("UCL ABC Class"). *Id.* at 1:12-13. He also seeks to certify two other classes under California's *Borello* test: (1) a four-year "UCL Cal. Lab. Code Class" and (2) "California Labor Code Subclasses" for alleged Labor Code violations. *Id.* at 3:1-19.

---

[4] The proposed class has no exclusion for owner-operators who operated as businesses, not individuals, owner-operators who operated multiple trucks or who used drivers, nor does it carve out the miles driven by drivers. ***Instead, Plaintiff seeks wages and expenses allegedly due to drivers, although they never contracted with CFL.*** SE 51. ***Plaintiff also does not remove owner-operators or workweeks where owner-operators worked primarily outside of California.***

### III.    <u>THE COURT'S ORDERS LIMITS THE APPLICATION OF THE ABC TEST</u>

The Wage Order provisions in Plaintiff's UCL ABC Class include those for minimum wages (Section 4), incomplete time records (Section 7(A)(3)), deductions for "cash shortage and breakage" (Section 8), and for expenses of "uniforms and equipment" (Section 9). C.C.R., tit. 8, § 11090, subd. 4 7(A)(3), 8, 9(B); Motion at 3:1-19; Notice at 2:19-3:4.

In seeking to certify the UCL ABC Class, **Plaintiff ignores the Court's prior orders**. The Court ruled, *twice*, as to which of Plaintiff's claims *Borello* governs, and which the ABC Test governs. In its 2019 order, it wrote: "***This Court agrees with CFL that Henry's claims for reimbursement, unlawful deductions, waiting time penalties, wage statement penalties, and violations of PAGA are not grounded in the wage orders … and must therefore be decided based on Henry's classification under the Borello standard***." Dkt. 87, at 17:21-26 (emphasis added). It confirmed this ruling on reconsideration in 2021, stating again: "***Plaintiff's claims for reimbursement, unlawful deductions, waiting time penalties, wage statement penalties, and violations of PAGA are not grounded in wage orders. They are instead based on the labor code and must, therefore, be analyzed using the Borello test.***" Dkt. 111, at 6:26-28, 7:7-9 (emphasis added). The only other viable claim Plaintiff pursues is one for minimum wages. *See* Dkt. 1-6 (FAC).[5]

Based on the Court's prior orders, prior to January 1, 2020, the ABC Test can only apply to the minimum wage claim. *Borello* applies to all other claims. Plaintiff's "UCL ABC Class" cannot apply to any claims for reimbursement or unlawful deductions prior to January 1, 2020.[6]

### IV.    <u>THE COURT CANNOT CERTIFY A CLASS UNDER THE ABC TEST BECAUSE THE NINTH CIRCUIT STAYED APPLICATION OF THE ABC TEST TO MOTOR CARRIERS AND THE "UCL ABC CLASS" LACKS NUMEROSITY</u>

The ABC Test cannot apply even to Plaintiff's minimum wage claims or to claims after January 1, 2020 for several reasons.

*First,* the Ninth Circuit has stayed application of the ABC Test as applied to the trucking industry in *California Trucking Association ("CTA") v. Bonta,* 996 F.3d 644 (2021) pending review

---

[5] Plaintiff did not plead a claim for failure to keep records under Wage Order § 7(A)(3). Even if he did, there is no private right of action for these claims. *Cordell v. PICC Lines Plus LLC,* 2016 WL 4702654, at *10 (N.D. Cal. Sept. 8, 2016).

[6] CFL met and conferred with Plaintiff about his third attempt to apply the ABC Test beyond his unpaid wage claims before and after filing this Motion, but counsel refused to remove these arguments. CE 1, Ferrantella Decl. ¶ 26; CE 25.

by the United States Supreme Court. RJN, Ex. 1.[7] The Supreme Court has not yet decided if it will grant certiorari. RJN, Ex. 3. The mandate remains stayed and the order enjoining application of the ABC Test to motor carriers remains in place. CFL is a registered and permitted motor carrier and the stay applies to it. SE 1. As the law stands, the Court should not certify any class under the ABC Test.

*Second*, if the stay lifts, any effort to certify the "UCL ABC Class" after January 1, 2020, fails because such a claim is not numerous. A class may only be certified if it "is so numerous that joinder of all members is impracticable." Rule 23(a)(1). The Supreme Court has held a class of 15 members lacks numerosity. *Gen. Tel. Co. v. E.E.C.C*, 446 U.S. 318, 330 (1980). CFL only contracted with five owner-operators who resided in California after January 1, 2020. SE 34.

*Third*, if the stay lifts, under any test, Plaintiff's proposed "UCL ABC Class" class definition is broken and the Court should not certify any claims under it because all of the underlying claims require individualized inquiries, as set forth fully below. *See infra*, §§ V, VI.E., VII.

## V.   THE PROPOSED CLASS IS BROKEN BECAUSE IT SEEKS RECOVERY ON BEHALF OF ABSENT, NON-CLASS MEMBERS FOR WORK THE PROPOSED CLASS DID NOT PERFORM AND EXPENSES THEY DID NOT INCUR

Under the Labor Code, an employee may recover wages for labor ***he or she performed***, not labor performed by other people. Lab. Code § 200 (defining a wage as "money or other value that is received by an employee as compensation for labor or services performed.") The same is true of work-related expenses: the duty to reimburse applies to expenses "incurred by the *employee* in direct consequence of the discharge of *his or her duties*," not those of others. Lab. Code § 2802. ***No authority suggest a class member may recover damages on behalf of other non-class members***. In fact, "every class member must have Article III standing in order to recover individual damages," which includes standing "for each claim that they press and for each form of relief that they seek." *Transunion LLC v. Ramirez*, 141 S.Ct. 2190 (2021). Pursuing the claims of others would violate a defendant's due process right because it must have notice of the claims against it, the parties must be before the court, and a defendant has a "right to present certain statutory defenses" to the claims. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). For similar reasons, courts impose a threshold

---

[7] *Bonta* arose after the CTA moved to enjoin AB-5 on grounds that the Federal Aviation Administration Authorization Act ("FAAAA") preempts it as to motor carriers. The district court granted the motion. The Ninth Circuit reversed, but the CTA moved for an order staying issuance of mandate and leaving the injunction in effect. RJN, Ex. 2.

requirement that any proposed class be ascertainable and readily identifiable, not amorphous or absent. *Pryor v. Aerotek Sci., LLC*, 278 F.R.D. 516, 523 (C.D. Cal. 2011).

The proposed class violates these rules. Plaintiff seeks to certify a class of all individuals who worked for CFL as truck drivers who CFL classified as independent contractors and resided in California during the period from October 20, 2011 to the present. Motion at 1. CFL only contracted with and classified some 70 owner-operators as independent contractors during the class period. SE 5-6, 40. It *did not* contract with the some 211 non-owner-operator drivers at all, so those persons cannot be in the class. SE 29, 44. However, here is the rub: CFL paid owner-operators on behalf of themselves *and* all their drivers. The owner-operators then decided what to compensate their drivers. SE 29-30, 32. ***Plaintiff and his declarants make clear they seek to recover damages in the form of wages, expenses, and penalties, for work performed by their drivers***. SE 51. ***In other words, the proposed class seeks recovery for unidentified, non-class members because it includes all owner-operators (including those with drivers), and does not carve out these revenues and expenses.***

Plaintiff's litigation by proxy approach violates the law and class certification principles for two reasons. *First*, Plaintiff and owner-operators cannot to recover compensation for non-driving time and other alleged labor performed by *other* drivers. Lab. Code § 200. Nor can they recover expenses allegedly incurred by *other* drivers and not themselves. Lab. Code § 2802. *Second,* class members lack standing to pursue the Labor Code claims of other non-class members by proxy. *Ramirez*, 141 S.Ct. at 2208. Ironically, owner-operators decided how to classify and pay their drivers, so they are effectively seeking damages for their own conduct. This overreach is fatal to certification.

## VI.   THE PROPOSED CLASS DOES NOT RAISE COMMON ISSUES OF MISCLASSIFICATION AND COMMON ISSUES DO NOT PREDOMINATE

The fallout of Plaintiff's overreaching class definition that includes entire businesses and all their drivers permeates all aspects of the certification analysis, including the *Borello* factors.

### A.   The ICA Does Not Establish a Uniform Right of Control Over the Manner and Means of Work

Even where there is a written uniform agreement, courts still must look outside the four corners of the agreement and address whether, "notwithstanding the form contract it entered," practical variations reflect a fundamental difference in the "right of control." *Ayala v. Antelope Valley*

*Newspapers, Inc.*, 59 Cal. 4th 522, 535-36 (2014); *see also Martinez v. Flower Foods, Inc.*, 2016 WL 10746664, at *13 (C.D. Cal. Feb. 1, 2016). Where, as here, there is a not a uniform agreement or a "practical allocation of rights at odds with the written terms" of a contract, the court indisputably must examine the parties' course of conduct. *See Ayala*, 59 Cal. 4th at 535.

Plaintiff's "uniform" theory of certification rests on a false premise. Although he contends all owner-operators signed the same ICA, many putative class members signed a different agreement, the LOA.[8] SE 5-6. Many owner-operators do not recall entering an agreement or the terms of it. For those owner-operators, their perceived control by CFL turned on their own interactions and perceived rights in practice. SE 7. Still others claim their rights differed from those set forth in the agreements, which again necessitates looking beyond the agreement's terms. SE 8.

## B.  The Right of Control Requires Individual Inquiries

Under the *Borello* test, the threshold question is not simply whether there is some right of control, but whether the supposed control is uniform and extends to the "manner and means" by which owner-operators conduct their business. 48 Cal. 3d at 350. This determination "must be evaluated on its facts," and the "circumstances may vary from case to case." *Id.* at 354; *Spencer v. Beavex, Inc.*, 2006 WL 6500597, at *7 (S.D. Cal. Dec. 15, 2006). Even where some common questions exist, where individualized inquiries cloud the analysis, courts deny class certification. *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478 (N.D. Cal. 2012); *Martinez v. Flower Foods, Inc.*, 2016 WL 10746664, at *13 (C.D. Cal. Feb. 1, 2016); *Magalhaes v. Lowe's Home Centers, Inc.*, 2014 WL 907675, at *4 (D. Mass. Mar. 10, 2014).

Individual issues predominate this inquiry. As noted above, there is not a single, "uniform" instrument of control. There are instead multiple operative agreements, proposed class members who do not recall signing any or even reviewing their terms and who necessarily rely on individual experience, and those who claim the exercise of control actually differed from the agreements. SE 5-8. Further, neither the ICA nor the LOA provide an extensive "right of control" or required owner-operators to run their business a certain way. To the contrary, they gave owner-operators substantial

---

[8] CFL produced the LOAs for proposed class members to Plaintiff in September 2018 (CE 1, Ferrantella Decl. ¶ 24) and their expert references them in his report. Dkt. 112-2, ¶ 7.

rights and discretion to run their business in critical ways, including: (1) the freedom to control their schedule and details in which they transported a load, (2) a lack of prescribed minimum hours or jobs, (3) the right to refuse assignments, (4) the ability to operate multiple trucks and hire multiple drivers, or work on a "team," (5) the ability for owner-operators (not CFL) to control details of their drivers' work, (6) the ability to choose their routes, and (7) the ability to contract with other businesses. SE 17-28, 34. These rights and discretion created significant variation in how owner-operators ran their business, from the size of their trucks and driver fleet and resulting alleged control over their drivers, the structure of their business, to wide variation in routes selected and time worked in California, and variation in services offered to other motor carriers. SE 33, 35, 40-49, 52-58, 60-64. Because the owner-operators used some 211 non-owner drivers (SE 44), the right of control would delve into highly individualized inquires of persons outside of the proposed class or before the Court.

Recognizing these apparent individualized questions, Plaintiff advances a theory with his declarants that the control over "all aspects" permeated the relationship, including control regarding schedule, routes taken, and the ability to work for others. SE 8. However, these rights do not advance a "uniform" theory of control. They are in tension with the ICA and the LOA, which provide *no* right of control over schedule "except [as] to the ultimate completed pick-up or delivery," and allow the owner-operator to provide services to other motor carriers. In similar circumstances, even in the face of uniform agreements (which do not exist here), courts find that the question of control is not amenable to class-wide proof. *Martinez*, 2016 WL 10746664, at *11-12.

**C.    Adherence to Federal Regulations Does Not Show a Uniform Right of Control**

Plaintiff ignores the above issues. Instead, he focuses on many elements of control that are actually not control at all, and fail to raise common issues of CFL's control under *Borello*.

Plaintiff first focuses on numerous alleged aspects of control that stem from DOT regulations. This is a red herring. "Incorporation of government regulations into a company's manual is not evidence of an employer-employee relationship." *Linton v. Desoto Cab Co., Inc.*, 15 Cal. App. 5th 1208, 1224 (2017) (quoting *N.L.R.B. v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1101 (9th Cir. 2008)). Compliance with legal requirements does not undermine a contractor relationship. *Lawson v.*

*Grubhub, Inc.*, 302 F. Supp. 3d 1071, 1084 (N.D. Cal. 2018); *Hernandez v. Triple Ell Transp., Inc.*, 175 P.3d 199, 204-05 (Idaho 2007) ("… adherence to federal law is no evidence of its control.")

Plaintiff points to vehicle inspections and electronic logging, driver qualifications and training, authorization for passengers in trucks, insurance requirements, CFL's registration number on the tractor, and licensing requirements. Motion, § II.4.A, II.4.B-C, II.5, II.7, III.5.A.ii.b. All of this alleged control stems from DOT requirements. The DOT, through the Federal Motor Carrier Safety Administration ("FMSCA") has regulations pertaining to vehicle inspections and accidents (49 C.F.R. §§ 396.3(a), 396.13; 49 C.F.R. § 390.15), the keeping of driver logs (49 C.F.R. § 395.8(a)), driver qualifications and training (including fitness for duty, alcohol/drug testing, and driver history checks) (49 C.F.R. § 385.5, § 391.15(a), 391.41(a)(1)(i), 391.23(m)(1)), insurance standards (49 C.F.R. § 387.19, 376.12(j)), authorization requirements for passengers (49 C.F.R. § 392.60), licensing and endorsements (49 C.F.R. §§ 383.93, 385.403), and display of CFL's DOT number on trucks (49 C.F.R. § 390.21). SE 38. CFL's non-compliance can result in civil penalties or disqualification. 49 U.S.C. § 14901, 49 C.F.R. § 391.15. Incorporation of DOT mandates in no way shows control.

Similarly, Plaintiff discusses an alleged requirement to adhere to the Professional Driver Performance Guide. Motion, § 4.B. This too is fiction. While Plaintiff and declarants refer to this Guide in declarations, at deposition, they told a different story. In truth, owner-operators—including Plaintiff and declarants—have no recall of the Guide, despite submitting declarations stating the opposite.[9] SE 80. A document that owner-operators uniformly did not see is not evidence of control.[10]

Further, to the extent an owner operator must comply with *customer* requirements, this does show "a right of control" on the part of CFL. *Martinez*, 2016 WL 10746664, at *11. Plaintiff alleges an "expectation" for delivery times based on a "Service Standard" established by CFL's "customer." Motion at 5:22-25; *see* SE 22. This contradicts the right of control in the ICA or LOA, which only discuss the "estimated time of departure and arrival," without a right to "exercise any control" over

---

[9] In his Declaration, Mr. Shipp falsely claimed familiarity with the Guide and attached it as Ex. 2. At deposition, he admitted he ***never received any attachments to his Declaration*** and did not know about the Guide. *Compare* Dkt. No. 112-8 ¶ 3 *with* SE 80, 84.

[10] Moreover, many of the Guide's provisions do not apply to owner-operators, including those regarding performance reviews (§ 400.110), discipline/warnings (§ 400.130), provisions regarding termination (§ 400.140), references to the Employee Handbook (§ 400.170), appearance of the tractor (§ 400.250), and selection of routes (§ 400.290). SE 80.

the "details of the work" and creates individual issues. What is more, owner-operators are not customer facing and can avoid any timeline simply by rejecting loads. SE 3, 21. However, if Plaintiff contends CFL exerts control due to *customer* standards, this is not control on the part of CFL.

### D.   *Borello's* Secondary Factors Require Individual Inquiries

The *Borello* secondary factors also require individual inquiries that bar certification.

### *Distinct Operation or Business*

Individualized questions also predominate the question of whether each owner operator is engaged in a "distinct occupation or business." Courts evaluating similar factual records have reached the *exact same conclusion: certification is improper because the "distinct business or occupation" factor requires individualized inquiries because of owner-operators varying use of helper drivers and vastly different business structures*. *Martinez*, 2016 WL 10746664, at *12 ("the 'distinct business or occupation' factor necessarily requires highly individualized questions because of drivers' varying use of helpers and sub-drivers"); *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 483 (N.D. Cal. 2017) (same); *Soto v. Diakon Logistics, Inc.*, 2011 WL 3515917, at *4 (S.D. Cal. Aug. 10, 2011) ("the putative class appeared to be fragmented because some class members operated more than one truck with multiple delivery teams and . . . some did not personally perform delivery services at all."); *Narayan v. EGL, Inc*., 285 F.R.D. 473, 478 (N.D. Cal. 2012); *Spencer,* 2006 WL 6500597, at *16.

The same issues exist here, in spades. Because owner-operators could operate as many trucks as they wanted, many owner-operators chose to operate a fleet of trucks and to hire multiple drivers, while others did not. This resulted in robust variation in business structure manifested in:

- *Trucks owned and operated*: Nearly half the proposed class operated multiple trucks, including at least eight owner-operators that operated a large fleet of more than five trucks, while Plaintiff and other owner-operators operated a single truck. SE 40-43 This means some owner-operators ran a fleet and supervised large-scale operations, with far less direct interaction with CFL and more with their own workforce, while the single truck owners would have had less business duties and more direct interaction with CFL.

- *Drivers used*: At least seven owner-operators enlisted the services of 10 or more drivers, while 22 owner-operators used the services of a single driver. SE 44-46. The Court will have to delve into issues of control of some *211 non-owner drivers* to determine control over an owner-operators business. This is inherently unmanageable, and likely impossible given the fact owner-operators identified additional drivers not present in the data, but cannot recall their identity. SE 30.

- *Routes Driven and Absentee Ownership*: Some owner-operators drove very few routes themselves, and some went years without driving, while others drove all or nearly all

routes. SE 52-55. Some owner-operators ran businesses as absentee owners, while others interacted more regularly with CFL on routes, again resulting in individual inquiries.

- _Business Structure and Operation of Other Businesses:_ Many owner-operators registered their businesses and advertised online, and contracted in the name of their business. SE 58-59. Others ran smaller sole proprietorships, family businesses, some had co-owners, some drove as "teams" with another driver, and some even drove under their own operating authority. SE 60-61, 63. Some owner-operators also engaged in other trucking or other business ventures, while others chose not to do so. SE 35, 62.

In nearly identical circumstances, courts have denied certification.[11]

### Skill or Profit

_Borello's_ level of skill and opportunity for profit factors also do not present common issues because of the entrepreneurial opportunities afforded to owner-operators. All the above variations affected the ability to generate profit, with some owner-operators generating millions in revenue and high six-figure profits per year, and others reporting modest revenue or losses. SE 68. Courts deny certification on similar facts. _Sotelo v. Media News Grp., Inc._, 207 Cal. App. 4th 639, 658-59 (2012).

### E.   Determining If California Law Applies Necessitates Individual Inquiries

Applying California's wage and hour laws to multistate workers is complicated. "California courts have long acknowledged a general presumption against the extraterritorial applications of state laws." _Campagna v. Language Line Servs., Inc._, 2012 WL 1565229, at *3 (N.D. Cal. May 2, 2012). The California Supreme Court has held California's wage and hour laws _might_ apply to work performed outside of California where "an employee resides in California, receives pay in California, and _works exclusively, or principally_, in California." _Tidewater Marine W., Inc. v. Bradshaw_, 14 Cal.4th 557, 578 (1996) (emphasis added).

The issue is further complicated. "California wage and hour protections to multistate workers may vary **on a statute-by-statute basis**." _Oman v. Delta Air Lines, Inc._, 9 Cal.5th 762, 772 (emphasis added)). For example, "the Legislature intended for section 226 to apply to workers whose work is not performed predominantly in any one state, _provided that California is the state that has the most significant relationship to the work_." _Ward v. Utd. Airlines, Inc._, 9 Cal.5th 732, 755, (2020) (emphasis added). _Ward_ held "this principle will be satisfied if the worker performs some work here and is based in California, meaning that California serves as the physical location where the worker presents

---

[11] Plaintiff's cases are inapposite. _Johnson v. Serenity Transp., Inc._, 2018 WL 3645640, at *10 (N.D. Cal. Aug. 1, 2018) involved "no evidence that _any drivers_ hired subcontractors or performed the services differently from other drivers."

himself or herself to begin work." *Id*. To the contrary, the Wage Orders have a different test. A court must determine whether each employee is a "wage earner of California." *Tidewater*, 14 Cal. 4th at 579. "If an employee resides in California, receives pay in California, and works *exclusively, or principally*, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of IWC regulations." *Id.* at 578. *Tidewater* did hold that Wage Orders *might* apply extraterritorially "in limited circumstances, such as when California residents working for *a California employer* travel temporarily outside the state during the course of the normal workday *but return to California at the end of the day*." *Id*. (emphasis added). Yet, *Tidewater* only addresses the Wage Orders, not the Labor Code generally. The court also declined to rule on "the application of IWC wage orders to [employees] who work *primarily* outside California's state law boundaries." *Id.* at 579 (emphasis added). Claims for reimbursement may follow yet another test. In *Campagna*, the court held Section 2802 does not apply to out-of-state work performed by nonresidents who primarily work outside California. It might apply, however, to "expenses that a nonresident employee incurs during periods of work performed in California." 2012 WL 1565229, at *3.

These multiple tests present significant obstacles to certification. *First*, CFL is an out-of-state employer residing in Texas. SE 1. *Second*, while Plaintiff seeks to certify a class of owner-operators who "resided" in California, many of the putative class members registered their businesses in other states and used out of state addresses. SE 59. Many of the above tests factor in residency and Plaintiff only pursues a class of California residents. *Third*, there are individual questions as to whether and when putative class members present themselves for work in California. 55% of all miles driven by owner-operators occurred *outside* of California. SE 70. However, this varied significantly, as 22 owners drove about 25% of less of their miles in California. SE 71. Putative class members actually "present themselves" for work in a myriad of different states, as some 9,297 of the 62,425 trips *started and ended wholly outside of California*, and another 32,562 trips spanned multiple states. SE 72. These distinctions lead to individual questions regarding: whether (1) an owner-operator resided in California, (2) "presented" for work in California, and (3) worked "primarily" in the state.

To make matters more complicated, Plaintiff does not distinguish between miles driven by the owners and drivers, but seeks to recover for both. SE 51. ***His expert ignores this data.*** SE 52.

This would lead to further slicing the above imperfect data across some 70 owner-operators and 211 non-owner drivers. SE 44. Further, the Court will have to conduct this inquiry each day, and pay period. To address the above issues, Plaintiff's expert simply removed all non-California miles out of the equation. Lietzow Decl. ¶¶ 12, 23. However, this does nothing to establish whether California law applies to each individual owner-operator or driver in the first instance. On the contrary, the Court *needs* that information to determine whether California law applies, on a daily and weekly basis. Because the tests are different for each claim, the Court will have to undertake numerous individual inquiries to determine whether California law applies. These inquiries will include: (i) whether a class member actually resided in California or provided services while "based" in California, (ii) if so, whether they provided services while based here for any given day, week, or pay period, (iii) whether they worked "primarily" within the state; (iv) whether they spent part, most, or all of their time driving in California during any given day, week, or pay period, (v) whether they worked part of the day in California and another part of the day in another state, (vi) whether they returned to California at the end of the workday, (vii) whether the miles driven reflect those of an owner-operator or of a driver, and (viii) whether owner-operators or drivers incurred any particular expenses or non-compensable time in California during any trip. Plaintiff proposes no manageable approach to address these issues. CE 34, Krock Report ¶¶ 14, 48.

Even if Plaintiff can present common issues of misclassification (he cannot), under any test, the claims asserted are unmanageable due to the realities of multistate work.

### F.   Plaintiff's Flawed Declarants Fail to Raise Common Issues

Plaintiff only offers four other declarants in support of certification. (*See* Dkt. 112-3 to 112-9.) The declarations are deeply flawed and do not advance Plaintiff's narrative for the reasons set forth below. Plaintiff also failed to authenticate them (*see* CFL's concurrently filed Objections).

- *Melvin Cartagena.* Mr. Cartagena could not speak English, yet he executed a declaration in English and never reviewed *any* written translation in Spanish. Instead, he relied on the verbal translation of his roommate. SE 81. More important, Mr. Cartagena is not a class member because he resided in Washington. SE 82. Since he is not a proposed class member and his declaration is inadmissible, the Court should disregard it. *Jack v. Trans World Airlines, Inc.*, 854 F.Supp. 654, 659 n.10 (N.D. Cal. 1994).

- *Fernando Garcia.* Mr. Garcia executed a declaration falsely stating he is a class representative in this case and understood his duty to prosecute the action. SE 83. He owned and operated at least 15 trucks, and had over 40 drivers. SE 42, 45. He promoted his

business Trams Freight Inc. online, executed an LOA in his business name, and offered custom training to his drivers. SE 47, 58-59. He executed an arbitration agreement to boot. SE 6, 74. *In short, Mr. Garcia operated a business that is larger than most small trucking fleets and is the poster child for how flawed and overreaching the proposed class is.*[12]

- *Michael Waldman.* Mr. Waldman does not recall executing the ICA despite definitively claiming he did in his Declaration. Dkt. 112-9 ¶ 2; SE 7. There cannot be a "uniform" right of control from an instrument he never saw. Moreover, he operated as an absentee owner, and did not drive his truck for years. SE 35. His circumstances highlight the individual issues replete in the proposed class.

- *DeShawn Shipp.* Mr. Shipp also does not recall ever executing the ICA despite claiming the same copy-and-paste narrative as Mr. Waldman. Dkt. 112-8 ¶ 2; SE 7. Worse, he executed a declaration with numerous attachments he claimed governed his relationship, but admitted he did not see receive them. Dkt. 112-8; SE 84. His Declaration is unreliable. Further, Mr. Shipp drove as a team, testified he used more drivers than those in CFL's records, and seeks wages on their behalf, but has no records how he paid them. SE 30, 60.

## VII. PLAINTIFF'S UNDERLYING CLAIMS PRESENT INDIVIDUALIZED INQUIRIES THAT CANNOT BE ANSWERED ON A CLASS BASIS

Besides establishing common issues that predominate the misclassification inquiry (which Plaintiff cannot meet), Plaintiff has to establish each of his claims can be certified. He cannot.

***Plaintiff's Unpaid Wage Claim and Derivative Waiting Time Claims***. Whether subject to *Borello* or the ABC Test, the Court will have to make the following determinations for each of the 62,425 trips because the wages sought include wages for driver non-class members: (1) who performed the alleged non-driving work (owner or driver); (2) where and when the unpaid time (inspection) occurred (California or another state, before, during, or after a trip); (3) whether the alleged unpaid time is subject to California law; (4) the length of the inspection; and (5) if a driver performed the inspection, (a) whether such time is recoverable by the owner-operator who did not perform the work, (b) whether the driver can be identified, and (c) whether driver already received payment for this time by the owner-operator. This claim raises numerous individualized issues that go to liability and damages. Worse, there are no records of the length of the inspection, and the owner-operators lack records for drivers, including pay records. SE 30, 86. Plaintiff's expert proposes no manageable solution, other than counting 15 minutes of pre-and-post inspection time and speculating at location. CE 34, Krock Report ¶¶ 30, 36-38. As a result, any unpaid claim and the derivative waiting time claims for unpaid wages at "termination" are not certifiable.

---

[12] Plaintiff withdrew the Declaration of Ernesto Sandoval. CE 1, Ferrantella Decl. ¶ 27, CE 26.  This makes sense: Mr. Sandoval is not a class member, as he served solely as a *driver* for owner operator Fernando Garcia. CE 37, Fitzgerald Decl. ¶ 37.

***Plaintiff's Expense Reimbursement / Unlawful Deduction Claim.*** Once again, because Plaintiff's damages seek expenses incurred by drivers (or related unlawful deductions), the Court will have to determine for each of the 62,425 trips: (1) who incurred the expense (owner or driver); (2) where the owner or driver incurred the expense (California or another state); (3) whether the alleged expense claim is subject to California law; (4) the amount of the expenses attributable to that specific trip; and (5) if a driver incurred the expense, (a) whether such expense is recoverable by the owner operator who did not incur it, (b) whether the driver can be identified, and (c) whether the owner-operator already received reimbursement for some of the expenses. CE 34, Krock Report ¶ 41-42.

## VIII.   PLAINTIFF CANNOT ESTABLISH RULE 23(B)(3) SUPERIORITY

### A.   A Class Action Is Unnecessary Here

A class action is not superior where each potential claim carries significant value and the putative class members can easily pursue them in separate lawsuits. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-92 (9th Cir. 2001); *Soares*, 320 F.R.D. at 485 (denying certification).

That is true here. Even excluding miles driven outside of California, Plaintiff's expert seeks $7.68 million in fuel costs alone. Lietzow Decl. ¶ 12, Ex. C. That is over $100,000 per proposed class member for just fuel. (*Id.*) Total alleged damages are $14.29 million, or $200,000 per person. (*Id.* ¶ 23.) While CFL disputes these calculations, the recovery sought is indisputably "significant." *See* CE 34, Krock Report ¶ 23. This is not a common wage-hour action where the recovery sought is minimal. Moreover, multiple owner-operators have already pursued actions against CFL. SE 87. Owner-operators are willing to bring individual actions because the individual stake is not "so small as to make a separate action impracticable." *Soares*, 320 F.R.D. at 485.

### B.   A Class Action Is Not Superior Because No Trial Plan Exists

A plaintiff "bears the burden of demonstrating 'a suitable and realistic plan for trial of the class claims.'" *Zinser*, 253 F.3d at 1189. He must present "plausible statistical or economic methodologies" that work on a class-wide basis, *Negrete v. Allianz Life Ins. Co. of North America*, 238 F.R.D. 482, 493 (C.D. Cal. 2006), and a "concrete, workable formula must be described before certification." *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.*, 247 F.R.D. 156,

176 (C.D. Cal. 2007). The Supreme Court warned against a "Trial by Formula" that deprives a defendant of "litigat[ing] its statutory defenses to individual claims." *Dukes*, 564 U.S. at 367.

Plaintiff's expert report proposes no manageable approach for resolving individualized liability issues of (1) control, (2) *Borello*'s secondary factors, or (3) whether California law applies. It also fails to include any class-wide proposal to determine whether the damages sought would apply to owner-operators or drivers, but lumps them all together. This goes to liability because an owner-operator cannot seek pay or expenses for work *not* performed. CFL's expert identified the numerous individualized issues that will need to be resolved, and lack of any proposed approach by Plaintiff's expert to resolve them. CE 34, Krock Report ¶¶ 14, 33-48. No manageable trial plan exists.

## IX.   PLAINTIFF IS AN ATYPICAL AND INADEQUATE CLASS REPRESENTATIVE

A class representative is not typical of the class if he or she is subject to unique claims or defenses. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507-508 (9th Cir. 1992). Here, there are numerous issues than make Plaintiff atypical of the proposed class, and inadequate to represent it.

### A.   Plaintiff Executed a Different Agreement Than Many Putative Class Members

Plaintiff executed the ICA with CFL, but never executed the LOA. SE 77. Others entered into the LOA. SE 73. The LOA contains different provisions regarding arbitration and indemnity (discussed below). *See* SE 13, 34. This makes Plaintiff an atypical and inadequate representative.

### B.   Plaintiff Is Not Subject to Arbitration But Other Proposed Class Members Are

Because Plaintiff did not execute an LOA, it also means that Plaintiff is not subject to arbitration, but others who executed the LOA are. SE 73-74, 76-77. The fact that the named plaintiff did not execute an arbitration agreement renders a plaintiff atypical of other putative class members and an inadequate class representative. *Avilez v. Pinkerton Gov. Servs., Inc.*, 596 Fed. Appx. 579 (9th Cir. 2015) (finding "potential defenses that [plaintiff] would be unable to argue"); *Tschudy v. J.C. Penney Corp.*, 2015 WL 8484530, at *3 (S.D. Cal. Dec. 9, 2015) (same). It also creates a lack of common issues that predominate because, "[i]f the proposed class is certified, the Court . . . may have to analyze the legality of the arbitration clause," which "overshadow[s] the common issues." *Conde v. Sensa*, 2018 WL 4297056, at *11 (S.D. Cal. Sept. 10, 2018).

**C.      Other Putative Class Members Are Subject to Other Unique Defenses**

The LOA also contains a distinct indemnity provision from the ICA to which Plaintiff is not subject. The LOA contains a provision for owner-operators to indemnify CFL from any claims brought by a driver arising out of their provision of services, including claims for "wages' or "benefits." *Id.* This indemnity provision is important because Plaintiff is seeking damages for the wages and expenses incurred by drivers of owner-operators. Since Plaintiff did not execute the LOA, other putative class members are subject to unique defenses. *Javine v. San Luis Ambulance Serv., Inc.,* WL 12672090, at *11 (C.D. Cal. Jan. 13, 2015) (individualized release defenses are atypical).

**D.      Plaintiff Presents Credibility Issues and is Antagonistic to the Putative Class**

A plaintiff who is willing to give "false and misleading testimony in an effort to further his interests in [the] litigation" is not an adequate representative. *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510 (N.D. Ill. 1990); *see also Kandel v. Brother Int'l Corp.*, 264 F.R.D. 630, 634 (C.D. Cal. 2010). Plaintiff re-submitted his August 2016 Declaration in support of his Motion. Dkt. 112-5. It contains inaccurate statements exposed at his 2018 deposition, yet he submitted it anyway years later in 2021. It includes disproven statements about: 1) the Professional Driver Performance Guide  (Declaration states it is a "manual of controlling rules"; at deposition, he admitted he did not know of the Guide); 2) being "deputized by the State of California" (he denied this at deposition); 3) "non-exempt hourly employees" and "fiduciary responsibility" (at deposition, he admitted he did not understand these statements); and 4) monthly updates about the case (he denied such updates at deposition). SE 85.

**X.      CONCLUSION**

For the foregoing reasons, the Court should deny the Motion in its entirety.

DATED:  November 3, 2021                          OGLETREE, DEAKINS, NASH, SMOAK &
                                                 STEWART, P.C.


                                                 By:  */s/ Spencer C. Skeen*
                                                      Spencer C. Skeen
                                                      Tim L. Johnson
                                                      Jesse C. Ferrantella
                                                      Attorneys for Defendant
                                                      CENTRAL FREIGHT LINES, INC.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 3, 2021.

By: */s/ Spencer C. Skeen*
       Spencer C. Skeen